Our first case this morning is McGee v. The Air Force. Mr. Fleming. May it please the court. My name is Larry Fleming and I'm an attorney from St. Louis, Missouri. It is my honor to represent before this court Richard McGee, who was a civilian employee of the Air Force, specifically Scott Air Force Base, which is located near St. Louis. Two things I think I want to emphasize as a predicate to what I'm going to argue, and that is, number one, Rick McGee's background. This is not by any means a nutcase situation where this guy is going off the deep end. The Merit System Protection Board summary summarized his background as follows. The appellant completed many years of honorable military service in the U.S. Air Force and was employed in a civilian capacity by the Department of the Air Force for approximately seven years. His second-line supervisor, Mr. Daley, and the deciding official, Colonel Kurt Piantowski, both testified that appellant's performance report contained glowing accolades. Mr. Fleming, at some point Mr. McGee refuses to surrender the Patriot, which is a significant kind of breach of his duty to protect the country, isn't it? Yes, it is. It's not a breach of his duty to protect the country because he had fully advised his chain of command, everybody under the sun, what he had discovered. The point of contention was how he had to comply with the Air Force regulations or the Department of Defense regulations regarding how this should be handled. He was very apprehensive about what he had discovered because as the FBI investigation indicated, they determined that although this was not operational or fully deployable in its current state, if modified, could present a malicious potential threat to the Department of Defense computer networks. But he purports to have a way to solve the problem which he will not surrender to protect against it. Not really to solve the problem. He purports to have a way to identify and present the problem. In order to do that, what he did not surrender was what he calls the source code. I'm not computer literate so I'm not too sure what a source code is, but they couldn't do much with it without the source code. Actually, they finally did. The FBI did. But in any event, it's his belief that DOD instruction 52.15.2 pertaining to computer security requires that he divulge this information such as the source code only to someone who is a designated approval authority. Even if you're correct in your argument that there was a protected disclosure here, and even if the regulation is exactly as you suggested, the court went on to find that they would have taken the personnel action against Mr. McGee regardless of his disclosures. And given the facts of this case, it's hard for me to understand how that's not true. Well, I think what you have to look at is the chronology of events. They say they would have taken the action that they did because of security concerns. But you have to understand that Mr. McGee, when this was discovered, and when most of the events that are related here occurred, was on medical leave because of stress-related problems. He was on medical leave from October 3, 2005 until December 21, 2005. And most of these problems occurred during that period of time. But then he comes back to work, and he is actually at work on his computer cranking in whatever data he needed to crank in between December 31 and February 15. If they were so concerned that he presented a security risk, then they were derelict in leaving him on the computer for a six-week period. Ironically, it's only after he files his complaint with the Inspector General that everything hits the fan. He is locked out of his office. He is basically arrested or detained, interrogated. His house is searched, his car is searched, and he is given leave. So is that your principal response to Judge Moore, that that establishes that they didn't have sufficient basis and established by clear and convincing evidence that they would have fired him in any event? That's correct. If they were going to fire him, again, if they're going to fire him... Well, I mean, welcome to the federal bureaucracy, in a way. I mean, we've seen a lot of these cases. I'm not sure you've seen many, but it doesn't strike me as unusual or prejudicial if an agency takes six weeks to get its ducks in order and to do a proper investigation. If, in fact, they had fired him right away, you would probably be up here arguing that they didn't do sufficient due diligence in order to take the action. So I'm having a hard time seeing how the fact that they let him back in the office for six weeks was somehow prejudicial or established that they didn't have a firm basis for firing him. It isn't a matter of firing him or not firing him. It's allowing him on that computer for six weeks when it's their belief or their contended belief that somehow or other he presents a security risk. Why in the world would they do that? It's my contention that that had nothing to do with it. What they fired him for was going to the inspector general after he had, in his opinion, exhausted all other avenues. Now, just a moment ago, you explained to me that he didn't surrender the Patriot Code because he thought he had to give it to someone in authority to receive it. But at the time, the argument was very different. He was looking for promotions or rewards or some kind of compensation before he'd surrender it. How do you explain the discrepancy? I think his one email was very inartfully drafted. He seems to say, well, how am I going to be compensated for this? And that was an outgrowth of some other projects that he had done wonderful work on and never even gotten any recognition for. He never says, I will not give you this source code unless my personnel problems are resolved. He says, I will not give you this source code until you show me who is the designated approval authority. That's what the DOD instruction requires, and this man is very much afraid of violating a security provision of the Air Force, not only because it would go back on him, but because he's very much a patriot. Well, that's not exactly what he said, though. I mean, he says, what benefit will I realize? Will I be compensated? Will I be named as the sole beneficiary? I mean, there's a suggestion, at least in this correspondence, that he's seeking sole benefit and not that he's doing some due diligence to help the government out, right? I mean, isn't it fair to construe these statements in the way I've just suggested? It's fair to construe them that way, but you also must consider that at the time that was sent, he was on sick leave for a psychological disorder. He was under great stress. The people who, when they came to talk to him about this at his home, it was at his invitation, but he was interrogated by the investigator for the Air Force, and he is, number one, on sick leave for a psychological disorder. Number two, he is taking medication. Number three, this is not the normal course of events where you sit somebody down and rationally explain things to them. This was an investigator who came to his house, who he got into an argument with. At his request. Came to his house at his request. He asked them to come to his house so he could demonstrate the Patriot Program. So this wasn't some interrogation, as you're suggesting. This was a single person who came to his house at his request so he could show them the computer system. That's true. He did ask them to come, but his primary concern all along is not his job promotion or job description or whatever else. He is very, very concerned that he has discovered something that is a security risk to the Air Force, and that is what he is trying to do. He's trying to get the right person. And Mr. Campbell, Agent Campbell who comes to the house, at least in Mr. McGee's opinion, had no idea what he was talking about. He was computer, compared to Mr. McGee, was computer illiterate. Mr. McGee wanted to talk to somebody who understood what he was saying and would convey the information up the appropriate chain of command. Now, if Mr. McGee does not have the Air Force's interest at heart here, there is no reason he would have gone through all of the machinations he did to try to get the attention of somebody that could do something about it. Mr. Fleming, the Board found that this wasn't even a protected disclosure, that no reasonable person would have perceived this as an effort to protect the Air Force. Well, certainly the security breach that he found, the vulnerability that he found, was found by the FBI lab to be a dangerous situation. But what's the wrongdoing by the Air Force that he is supposedly disclosing? Their inability or unwillingness to process his concerns through DOD instruction 52.15.2. There is an instruction out there that says what you do when you discover a vulnerability. Nobody was following it. One thing the Air Force did was to ask him to give them the code that would solve the problem. The question is, to whom can he give the code? Who is an authorized person? And that's his hang-up. If someone had come to him and said, I am a designated approval authority, here is the general's designation, I'm the person to whom you should talk, I have the security clearance, I have a top secret clearance, I'm going to be a safe person to talk to about this. He would have. Do you want to save your rebuttal time? I do want to save my rebuttal time. Thank you. Thank you. Ms. Gerber. May it please the Court. Mr. McGee threatened to use his position and the patriot exploit in a manner harmful to the United States, and he attempted to leverage the patriot vulnerability for his personal gain. That is why he was fired, not because of his OIG complaint. So as Mr. Fleming pointed out, how, given all of these risks and this egregious behavior, did the government let him go back to work for six weeks with access to all of this information that was relevant? Well, as Your Honor pointed out, the fact that there was some sort of lag does not indicate that the Air Force didn't take Mr. McGee's threat seriously. I know what I argued to Mr. Fleming, but we've seen in numerous cases there are sort of intermittent suspensions that occur when the government perceives there's any real problem or any real risk. So they don't actually fire someone without taking their time, but they do put them on administrative leave when there's any perceived danger or risk with regard to employee behavior. Well, at the time of the November 29th email, Special Agent Campbell was still attempting to negotiate and work with Mr. McGee to get the code. The technical director, Mike Carl, was also still trying to work with Mr. McGee. So the fact that the Air Force did not believe Mr. McGee was the next day going to do something to harm the computer systems does not mean that they didn't take it seriously, that he might, and that once it became clear that Mr. McGee was not going to turn over the code, that's when they called in the FBI, that's when he was placed on administrative leave, and he was... But when was that exactly? Was that after he'd been back for six weeks and then he was placed on administrative leave, or was it right after he came back? He was placed on administrative leave on February 15th, which was a few weeks after he returned to the office. Yes. And what about the designated person to receive the code? Well, the board found that the instruction, instruction 5215.2, had nothing on its face that suggested that Mr. McGee had to report only to someone with the title designated approving authority. And Mr. McGee, there's no evidence that Mr. McGee ever consulted with anyone else trying to figure out what the instruction meant. And given the fact that he also explained that the reason he wasn't giving the code was because it wasn't ready, because he was trying to actually negotiate some sort of transfer or different situation in his working environment, that indicated that there wasn't any reasonable belief that Mr. McGee was actually reporting a violation of DOD instruction 5215.2. And if you look at the instruction, the instruction says that these vulnerabilities should be reported to a focal point and that focal point will develop procedures to sort of go up the chain of command within the DOD and the focal point will report to a designated approval authority. It does not say that the designated approval authority is the only person who can receive this sort of information. Now, Mr. Fleming repeatedly referred to the fact that his client was on sick leave, medical leave at the time all of this occurred, and that he was suffering some sort of stress-related anxiety. Is that something that the government or his employer had to compensate for or at least take into account in construing how his actions might have affected his future employment? Well, his supervisors were certainly aware of the fact that he was on sick leave and that these investigations were going on at his home. But the fact that he was on sick leave doesn't change the way the Air Force can interpret the e-mails that he sent, the statements that he made. The fact that he was on sick leave doesn't in some way mitigate the... Well, it may or may not, right? I mean, we don't know. I mean, if he had medical information to demonstrate that this was an intermittent problem, he was under anxiety for a discrete period of time, and that indeed infected his choices and his behavior, then wouldn't that be something that the agency should account for? It would be, but Mr. McGee has not made any argument that he was on some sort of medication that should completely negate the content of his e-mails and his statements and his statements in person. He repeatedly, both before he came back from sick leave and after he came back from sick leave, he stated that he wasn't going to give up the code. And this is, you know, the crux of the matter is that the Air Force couldn't evaluate the patriot vulnerability and its exploit without seeing this code. And the fact that Mr. McGee wouldn't give that up is, at the end of the day, why they had to take seriously these allegations that he wasn't ever going to give it up and that he expected something in return. Was he fired because he wouldn't give it up or because of the threats he made with regard to it? Because I didn't understand the board as finding he was fired because he wouldn't give it up. I thought that their focus was, you know, he threatened to sell it to North Korea or Microsoft or, you know, that sort of thing. Am I wrong? No, Your Honor, you're correct. The specification, the charge that he was- I'm not meaning to analogize Microsoft and North Korea. The fact that there were three specifications, and the first one was that Mr. McGee was attempting to leverage the patriot vulnerability for his personal gain, and that has to do with the fact that he wouldn't give up the code until- and he repeatedly said that he wouldn't give it up until he was assured that he would be the sole beneficiary, that he would be, you know, compensated for his efforts. The second and third had to do with the threats that he made. The second and third specifications were the allusions to selling something to North Korea, giving Microsoft sort of the code. So those two were separate specifications, but each one the MSPB found that those were both substantiated and that the Air Force did show that those charges were valid. And the government's position is that this was not a protected disclosure as a matter of law? It is, Your Honor, and that there is substantial evidence to support the board's finding that this wasn't a protected disclosure because of the board's credibility determination of Mr. McGee's statement that the reason he didn't want to give the code up was because of this instruction. The board found that that wasn't credible and that that- I don't see what that has to do with whether or not he made a protected disclosure. Well, the protected disclosure requires a reasonable belief and- That's correct. And his argument was, as I understood it, the Air Force failed to identify the right person for me to give this to, a person who would have proper clearance and et cetera, et cetera. I can't just hand it over to anybody in the government. I mean, how do I know they're going to handle this with the level of propriety and security required? And the regulation lays out a designated approval authority or an AIS resource manager. And Mr. McGee argued, as I understood it, that he kept asking and nobody would tell him who either of those people were. Well, in his discussions with the technical director, Mike Carl, he asked if- Mr. McGee asked if Mr. Carl would be able to be the person in the instruction that he could report to, and Mike Carl said yes, that he could comply with 5215.2 and that he could receive the code and report it up the chain of command. And Mr. McGee still refused to give it to Mr. Carl. Well, is Mr. Carl an AIS resource manager or a designated approving authority? He is not- So if he's not either of those two things, and if the regulation says Mr. McGee needs to turn it over to one of those two people, why does a random employee statement, you can give it to me, somehow satisfy the agency's obligation to comply? Well, the agency's-Lieutenant Colonel Gill stated in his testimony that this- because the Air Force itself has the capability to evaluate this vulnerability, this instruction itself doesn't apply. It doesn't need to go through a designated approving authority up the chain to the sort of head of the DOD component. But the fact that nothing on its face of the DOD instruction indicates that the Air Force was violating the instruction, and the fact that Mr. McGee didn't request any sort of assistance in interpreting this instruction indicates that he didn't really believe that he was- The fact that he didn't ask for assistance in interpreting it? I don't understand your argument at all. It says he has to give the sensitive information to one of these two people. How is that-Why does he need interpretation? He kept asking, identify for me one of these two people, and nobody would. He was told that he needed to give the code to the special investigator, or rather the special agent Campbell, or to Mr. Carl. Those people do satisfy the Air Force's internal procedures for reporting these vulnerabilities, and the instruction itself says that the agents, or rather the DOD components, will develop procedures for reporting the technical vulnerabilities. It doesn't say that-It doesn't actually lay out the specific procedure. Now, the board's analysis of the interpretation doesn't have to be Mr. McGee's interpretation. Mr. McGee could have-If he reasonably believed that the instruction were being violated, then that would constitute a protected disclosure, but the board found that given all of his statements, and given all of Mr. McGee's discussions with the Air Force, the board did not find Mr. McGee's statement credible, that he did, in fact, believe that this was a violation of the instruction. The board-The AJ, at the very end of its opinion, has a sort of one-paragraph conclusion, right, that sort of an alternative-Is that-Do you read that as an alternative, where they say no matter what, even if it was a protected disclosure, the agency is established by clear and convincing evidence that they would have fired him anyway? Yes, yes. That's a separate and independently sufficient reason to affirm the board's decision that even if it were a protected disclosure, the board found that there was clear and convincing evidence that even if it were a protected disclosure, the agency would have fired Mr. McGee anyway. And it referred back to its in-depth analysis of the seriousness of Mr. McGee's misconduct, and that in itself establishes the clear and convincing evidence, that whole discussion that the board had of the various emails, the discussions with Special Agent Campbell, the contact that he had with a foreign corporation, all of these things, the fact that the FBI was brought in, there was an investigation, Mr. McGee was put on administrative leave, that indicated through clear and convincing evidence that even absent the OIG complaint, steps were underway to fire Mr. McGee, and Mr. McGee eventually would have been fired, even if he hadn't filed with the OIG. Did Mr. McGee actually contact Adelphi, this magazine? Yes, Your Honor. He did contact the company. It's unclear what he actually spoke to Adelphi about, but when he spoke with Mr. Carl in December of 2005, Mr. Carl was informed that he was talking about the Patriot Program to this computer magazine. We respectfully request that this Court affirm the MSPP's decision. Thank you. Thank you. Mr. Fleming, you have four minutes. It's important for the Court to understand the chronology that all this occurs in. Keep in mind, Mr. McGee was not fired when he had his problems with misunderstanding as to who he should contact, who he should turn this over to. He was not fired until two years later, on February 28, 2008. When did he contact the Adelphi? He did that in January of 2006, but according to him, he contacted Adelphi to get permission to use an article that they had published along these same lines about computer vulnerabilities in something he was going to publish. He wanted their permission. When you start taking information like this outside the family, the Air Force family, that becomes a significant threat. Well, I don't think anybody ever followed up on what he told Adelphi or what he asked Adelphi. It was his contention that his only concern was getting their permission to use an article that they had published. But, whatever it was, the chronology is just unmistakable here. He is locked out of his office, searched, interrogated, within days after he files his Inspector General complaint. Despite the fact that six weeks had transpired before then, he isn't fired until two years later, almost two years later, after the U.S. Attorney had determined that there was no basis for any prosecution. But he wasn't even told that. He was on the hot seat for almost a year and a half, while he thought he was being investigated for criminal violations, after it had been determined there weren't any. As to his concern over this designated individual, his testimony, I think, was fairly clear at the hearing. He was asked, so who was the person you were waiting for for someone to introduce you so that you could comply with the instruction and disclose what needed to be disclosed regarding Patriot? McGee, only the job by title alone. And what was the job title? The designated DAA, designated approval authority or AIS, or also the AIS resource manager, automated information resource management. O'Case, had you ever been introduced to somebody who described himself or herself as that person? No. Had Colonel Mercer, instead of sending Agent Campbell out to your house, sent somebody who identified themselves as the person described in the DOD directive, had he sent somebody out who described themselves as that person and appropriately identified themselves, would you have fully cooperated in turning over everything you had, including the source code? Yes. Would you have done that without any caveats in terms of what benefit would come to you? McGee says, I would have done that without hesitation. His concern, Rick McGee is a very, very hyper person. He is very concerned about security, and his background on all the projects he had worked on for the Air Force indicates this. He is very sensitive to talking to somebody who is not authorized to receive the information which he is disclosing. In this situation, the disclosure, I think, is highlighted by the conclusion of the Air Force Investigative Agency, which depended on an FBI analysis, when they say while the version of Patriot that we analyzed was not an operational exploit, it can be deployed by an attacker. The technology is sound enough to warrant concern for current Air Force information. The minimal effort by an attacker would allow Sentry as a low-level key logger to be hooked up to a much more capable WNP, possibly with exfiltration capabilities of the username's password. The general attack methodology offered by Patriot has been validated. The Air Force agencies responsible for securing information operation should be notified of Patriot and its potential capabilities. Mr. Fleming, do you have a final thought for us here? Yes. Look at the chronology. He wasn't fired because of his refusal to turn over the source code. He was fired because he took up the Colonel's threat and said, if you don't like this, go to the Inspector General, and he said, that's what I'm going to do. Thank you, Mr. Fleming. Thank you.